Eugene J. Davis v. Commissioner. Shirley M. Davis v. Commissioner.
Davis v. Commissioner
Docket Nos. 5731-64, 951-65.
United States Tax Court
T.C. Memo 1966-116; 1966 Tax Ct. Memo LEXIS 165; 25 T.C.M. (CCH) 616; T.C.M. (RIA) 66116; May 31, 1966
Frank C. Scott, P.O. Box 1904, Stockton, Calif., for the petitioners. Martin A. Schainbaum, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the income taxes of petitioners as follows: Year
Eugene J. Davis
Shirley M. Davis
1960
$1,760.67
$1,760.67
1961
2,002.47
2,002.47
1962
2,206.44
2,206.44
1963
1,116.92
1,116.92
For the years 1960, 1961 and 1962 petitioners filed joint returns. Accordingly, the notice of deficiency received by each petitioner contains identical and duplicate adjustments for those years. For the year 1963, each petitioner *166 reported one-half of the income (community) earned by both on separate returns, and the deficiency against each taxpayer for that year was determined in respect of the one-half thus reported. The sole issue is the deductibility of losses incurred by petitioners in their operation of a horse breeding farm during the years 1960-1963. The Commissioner has not questioned any of the individual items of income or expense reported by petitioners with respect to the farm. Findings of Fact The stipulation of facts filed by the parties together with the exhibits attached thereto are incorporated herein by this reference. Petitioners, Eugene J. Davis and Shirley M. Davis (hereinafter sometimes referred to as Eugene and Shirley), were husband and wife during the years 1960, 1961 and 1962. They separated in 1963 and an interlocutory decree of divorce was rendered in 1964. In 1964, Eugene took up residence in Mexico. Eugene and Shirley filed joint income tax returns for the calendar years 1960, 1961 and 1962. They filed separate returns for the year 1963. During each of the taxable years here involved they filed their returns using the cash method of accounting. Eugene was born in Los *167 Angeles, California, in 1920. His interest in agriculture and horses dates back to his childhood. His father, John Charles Davis, a wellknown horseman, was in the seed business in California, and maintained farms for growing seed on which he also raised horses. Eugene lived and worked on his father's farm until he started college. In 1944, Eugene received a Bachelor of Science degree in engineering from the University of California at Berkeley. While attending college he worked summers and some week-ends in Shasta County, in northern California at a sawmill and "ran" Hereford cattle and kept some horses there on a ranch owned by his mother and stepfather, in order to help pay for his tuition. In 1945, Eugene went into the sawmill business in Shasta County with his mother and stepfather, and in 1946 when Eugene and Shirley were married they lived in Shasta County. In 1948 petitioners moved to Stockton, California. Early in 1950, they purchased as joint tenants with Eugene's father a 30 acre farm two and one-half miles east of Lodi, California, near the town of Lockeforde, California, at a total cost of $21,520.22. The property had a three-bedroom house, a two car garage and various *168 out buildings. Subsequently, prior to 1955, petitioners acquired an additional 20 acres of adjoining land. From 1948 to 1950, Eugene was employed on a full-time basis as an engineer by the County of San Joaquin, California. From 1950, until and including the taxable years here involved, he was employed on a full-time basis as an engineer by the State of California, Department of Highways, Division 10, Stockton, California. In 1951, Eugene had a horse accident and broke his leg, and was off for a good part of that year. Also in 1951, Shirley became employed as a fulltime bookkeeper for Pacific Freight Lines. She was thereafter employed on a full-time basis as a clerk by the County of San Joaquin, and during each of the taxable years here involved was a full-time typist for the State of California, Department of Highways, Division 10, Stockton, California. Eugene's father moved to the farm in 1950, and lived there with petitioners until 1954 or 1955. He then moved to the East for a year or two after which he returned to the farm for about six months. Thereafter, he went back to the East and remained there until his death in February of 1963. Eugene and his father had brought about *169 30 or 35 horses to the farm in 1950. Some were palominos, but the majority of them were Morgan horses. Eugene's family had been raising Morgan horses for a long time. As far back as 1853, Eugene's grandfather raised Morgan horses in Michigan, Illinois and Wisconsin. And, in 1903, when Eugene's father moved to California he took with him some of the Morgan horses that had been bred by the Davis family during the preceding 50 years. In 1939 Eugene's father had purchased Red Vermont, an outstanding Morgan horse for $5,000. [1] During that year, prior to the purchase, Red Vermont had won the United States Congress Justin Morgan Gold Medal Award, for being the stallion that most nearly resembled the original Justin Morgan horse. The award was given in recognition of the Morgan horse's participation in the building of the United States. Red Vermont was bred extensively by Eugene's father, and sired about 2,000 horses. Red Vermont was one of the horses brought to the farm in 1950, and between 50 and 75 percent of the others were *170 descendants of his. Many were also descendants of horses that had been owned by the Davis family in 1853. Between 1950 and 1953, petitioners and Eugene's father bred and trained these horses. In 1953, they concluded that the market on horses was going bad, so they sold at public auction about 30 of the approximately 40 horses that they had at that time. All of the palominos were disposed of along with a substantial majority of the Morgans leaving only about ten Morgan horses, including Red Vermont and several of his descendants, remaining on the farm. After the sale petitioners turned their farm into a dairy operation. By 1958 they had about 80 head of Holstein cattle of which they were milking about 40 head. During this time some of the horses were used for work around the farm and a few were bred. Petitioners never made a profit in any year from the dairy operation, and in 1958 or 1959 they sold out their dairy herd. They also attempted, unsuccessfully, to conduct a beef cattle operation on the farm. From 1959-1963, petitioners again concentrated their agricultural efforts on the raising of Morgan horses. However, there were not enough horses to use the feed or anything else, *171 so they took in cattle on a pasture rental basis, and boarded some horses for others. Also, they farmed about 120 acres of leased land, some of which required irrigation. The crops planted were alfalfa and oat hay. In attempting once again to raise Morgan horses, petitioners made use of the horses remaining on the farm after the 1953 sale and their offspring all of which were registered Morgans. There were 13 such horses most of which were descended from Red Vermont. The ancestry of several of them went back to horses owned by the Davis family in 1853. In the years involved herein, 1960-1963, petitioners' herd grew from 13 to 35 horses and by the end of 1964 they had 47 horses. During this period petitioners bought and sold a few horses and on at least two occasions traded horses owned by them for others. However, most of the growth of their herd was due to natural increase. As already noted, Eugene and Shirley were full-time employees of the State of California during the tax years, he as an engineer and she as a typist. Their earnings in those capacities were as follows: Eugene
Shirley
1960
$8,282.00
$4,097.80
1961
8,520.00
4,890.40
1962
8,864.00
5,165.00
1963
9,036.00
5,280.00
*172 Apart from the farm and a small gun repair business conducted by Eugene (which produced a loss of $107.99 in 1960 and a profit of $80.85 in 1961), the income tax returns filed by Eugene and Shirley discloses no sources of income of consequence other than their salaries as state employees. They owned no securities, real estate (other than the farm) or any other kind of income producing assets. For the years 1960-1963 petitioners reported farm receipts, farm expenses (including depreciation), and farm losses as follows: Farm
Farm
Farm
Years
Receipts
Expenses
Losses
1960
$4,105.66
$12,933.74
($ 8,828.08)
1961
4,024.07
14,837.41
( 10,813.34)
1962
4,176.09
17,544.99
( 13,368.90)
1963
2,759.54
17,085.44
( 14,325.90)
The farm receipts in each of those years according to petitioners' returns came from the following sources: 1960
1961
1962
1963
Farm Receipts: Sale of horses raised
$1,000.00
$ 815.00
$ 750.00
Profit on sale of purchased
horses *
$ 350.00
323.44
Breeding fees
655.00
605.00
625.00
400.00
Fair premiums
120.00
Sale of cattle
350.00
Sale of dairy products
146.63
Pasture rental
1,777.16
2,259.07
1,623.59
** 496.60
Boarding fees
701.87
110.00
460.50
487.50
Sale of hay
122.00
257.00
Sale of dogs
125.00
25.00
110.00
40.00
Sale of mule
300.00
Sale of nuts
5.00
Hauling
25.00
Total Farm Receipts
$4,105.66
$4,024.07
$4,176.09
$2,759.54
*173 The farm expenses, including depreciation, during the tax years were as follows: 1960
1961
1962
1963
Expenses: Labor
$ 1,842.89
$ 1,686.54
$ 1,006.30
$ 2,394.60
Feed purchased
852.81
1,103.79
1,217.36
330.38
Seed purchased
132.15
513.11
193.22
Machines hired
158.28
254.95
667.50
911.64
Supplies
514.14
655.90
1,130.54
800.94
Repairs, maintenance
991.50
1,163.65
1,160.08
1,191.50
Fertilizer
257.86
Veterinary & medicine
235.75
308.98
327.81
260.80
Gasoline, fuel, oil
900.04
595.84
780.70
432.46
Taxes
110.00
1,269.16
250.28
335.74
Insurance
319.21
706.04
422.88
613.22
Interest
548.60
371.96
861.52
1,106.44
Utilities
773.57
1,100.82
1,216.81
1,147.92
Rent, pasturage
774.88
586.55
650.00
Trucking
11.82
12.62
69.74
25.50
Advertising
312.97
397.79
122.99
264.00
Postage
25.18
45.43
40.61
79.38
Bedding for horses
63.18
136.24
138.00
81.00
Bank service charges
64.56
74.36
48.00
24.42
Horse Club & Show
92.48
66.00
274.50
139.00
Registrations & transfers
101.00
185.00
50.00
112.50
Publications
24.60
54.14
66.14
28.24
Automobile expenses
93.38
140.38
227.54
117.88
Business travel
1,170.34
Stock dogs
55.00
Other expenses
78.16
4.40
Office rent
245.62
Loan expense (escrow)
94.85
Association dues & expenses
120.24
139.54
137.24
Entertainment
67.15
75.00
Legal fees
90.00
80.00
Total cash expenses
$ 9,334.01
$11,198.38
$11,546.95
$12,228.38
Depreciation
3,599.73
3,639.03
5,998.04
4,857.06
Total Expenses
$12,933.74
$14,837.41
$17,544.99
$17,085.44
*174 Since petitioners were employed full-time by the State of California during the years in issue, they could devote only evenings, week-ends and vacations to the farm. However, with the assistance of their two daughters, petitioners did the haying, irrigation, horseshoeing, cleaning of stalls and barns and most of the other work required to be done on the farm, as well as the breaking and training of the horses. Eugene was primarily responsible for the training of the horses, and Shirley kept the books and paid the bills for the operation. For the years 1960-1963, the following were the amounts spent for hired labor. 1960
$1,842.89
1961
1,686.54
1962
1,006.30
1963
2,394.60
On August 29, 1965, Eugene put the entire herd up for sale at an auction. However, only 18 horses were in fact sold. Rather than let the other 25 or 30 horses go at very low prices Eugene decided to withdraw them from the sale. The net proceeds received by petitioners from that sale were $6,680.52. An additional sale of a horse in Mexico in 1965 yielded $1,200. Also, one three year old raised mare was sold for $6,500, and a $500 deposit was received. However, it was agreed that the horse *175 would be kept on petitioners' farm while the purchaser was readying his facilities for it. During this time the horse was injured accidentally. The sale was rescinded by mutual agreement, and the $500 deposit was returned. The remaining horses have not yet been sold and are still on hand. Opinion RAUM, Judge: During the years in issue, 1960-1963, petitioners operated a farm on which they bred and trained Morgan horses. Although they sustained losses each year from this operation, we are convinced that it constituted a "trade or business" so that the losses therefrom are deductible under Section 162 and 165 of the 1954 Code. [2]
*176 We recently had occasion to consider the criteria to be taken into account in passing upon the deductibility of expenses or losses in cases like the one before us. . The central issue is one of fact, namely, whether the farming operation was in fact conducted with a bona fide intention of making a profit. And we have resolved that factual issue in petitioners' favor herein upon the basis of the record before us. To be sure, the financially unsuccessful operation of petitioners' farm during the tax years was preceded by a history of losses in prior years, which is itself a highly suspicious circumstance. But when that fact is considered in the light of the record before us, its importance virtually disappears. This is not a case of a gentleman farmer or of "hobby losses." Unlike, the taxpayer in Bessenyey, petitioners were persons of modest means with no source of income of consequence outside their combined wages as an engineer and typist, respectively, which ranged from about $12,000 to about $14,000 during the tax years. Eugene's agricultural background served him well during his college years, when he engaged in activities *177 involving cattle that helped him pay his tuition. The farm now in question was purchased some four years thereafter. We are fully satisfied that the farm was operated for the purpose of making a profit. When the horse breeding activities proved unprofitable during the years 1950-1953, they were abandoned, and petitioners attempted to conduct a dairy operation. This, too, was unsuccessful, and petitioners endeavored to raise beef cattle. But the latter activity was also financially unsuccessful, and petitioners finally went back into the horse breeding business around 1959. Throughout the history of the farm, we find petitioners trying to operate it so as to make a profit, changing from one type of operation to another in order to attain that end. The fact that Eugene was fond of horses or that there was even a sentimental interest in the Morgan horse does not detract from the solid fact herein that he was honestly trying to conduct his farming operation on a profitable basis. On the basis of the evidence before us, we have found that the farm in question was operated as a bona fide business during the years in issue. Decisions will be entered for the petitioners. Footnotes
1. This finding as to a $5,000 purchase price is based upon testimony which is erroneously reported in the transcript as showing a $50,000 purchase price.↩
*. In both instances the horses were reportedly sold in the same year in which they were purchased. ↩
**. Excess of pasture rent received over pasture rent paid.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *
SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business;↩